J. E. WEEKS, Complainant-Appellee, v. W. J.
SUMMERLIN, Defendant-Appellant.
—466 S.W.2d 894.

Middle Section. November 27, 1970.

Certiorari Denied by Supreme Court May 3, 1971.

John D. Whalley, Nashville, for complainant-appellee.

Joseph L. Lackey, Jr., Nashville, for defendant-appellant.

TODD, J. The defendant, W. J. Summerlin, has appealed from a chancellor's decree awarding to the complainant, J. E. Weeks, a judgment in the amount of $7,300.00 plus $200.00 interest and costs.

For clarity the parties and others will frequently be referred to herein by surname or by abbreviated corporate title.

The bill alleged that on April 15, 1969, complainant Weeks, through his agent, Frank Oakley, delivered to defendant Summerlin a cashier's check in the sum of $7,300.00 under an agreement that said sum would be held in trust pending the procurement of $230,000.00 in financing for Standard Record Pressing Company, Inc.; and that defendant would return said $7,300.00 to Weeks with interest if said $230,000.00 in financing was not obtained within 60 days. The bill further alleged that said financing had not been obtained and that said $7,300.00 had not been returned to complainant after demand.

The answer of defendant admitted the receipt of said $7,300.00, but alleged that the money was received by defendant on behalf of Standard, denied that the money was received to be held in trust and denied that defendant was liable to complainant as charged in the bill.

Except as indicated, there is no conflict in the evidence.

Prior to any transaction material to this case, complainant had occasion to consult with defendant and learned that defendant was in the business of procuring loans and other forms of financing for enterprises in need of such service.

Early in the year 1969, complainant learned that Standard was in need of certain financing and complainant was instrumental in bringing together the defendant Summerlin and Mr. J. D. Tyner, president of Standard.

On or about March 5, 1969 Tyner and Summerlin agreed that for a period of 30 days, Summerlin would undertake to obtain certain financing needed by Stand-

ard. At that time, Standard had an outstanding mortgage indebtedness of $230,000.00 which needed to be refinanced; and between $30,000.00 and $100,000.00 additional capital was needed.

At some time between March 5 and March 13, 1969, Summerlin conferred with Third National Bank, the holder of said $230,000.00 mortgage which was also secured by the signature of Albert Maloney, owner of one-half the stock of Standard. Summerlin claimed to have made some arrangement whereby Maloney would continue to be surety on the loan and Third would extend payment of same. On March 13, 1969 Summerlin went to the office of Tyner and dictated a letter which Tyner signed, as follows:

March 13, 1969

"Dear Bill:

With the execution of the attached contract by Mr. Maloney our agreement of March, has been fulfilled. I have attached herewith my check in the amount of $17,500 which is to cover the balance of your fee.

I would appreciate greatly your holding this check until I give you a release of it next week, as we still want to put additional capital in our Company before the check clears.

I am going to need your help and advice in establishing the new management and operation, as we have frequently discussed during your stay here. I will greatly appreciate you arranging to come back to Nashville, next week, preferably Monday, so we can continue where previously left off.

Sincerely,<br>J. D. Tyner"

The $17,500.00 check referred to in the letter was a post-dated check of Standard which was deposited by Summerlin but was never honored. Tyner testified that the "attached contract" was never "executed" by Mr. Maloney, hence "our agreement" was never fulfilled; and that payment was stopped on the $17,500.00 check because "we didn't have the money."

About March 18, 1969, upon recommendation of Summerlin, Weeks delivered to Tyner a check in the amount of $7,300.00. Said check was postdated two weeks to enable complainant to deposit the funds necessary to honor the check. At the time of this transaction, Summerlin dictated, Tyner signed and Weeks accepted the following letter:

March 18, 1969

"Dear Joe:

I have attached hereto my personal demand note which is executed and is in connection with your loan for the same amount of the note. You are borrowing this money from your bank and I will pay their interest rate. My note is a 90 days unsecured personal note.

You also have been instrumental in refinancing of Standard Record Pressing Company and I have agreed to pay you $5,000. In lieu of this as per our agreement, I am giving you the right to convert this to a loan which you accept and in the stock option plan you will have the right to convert this to 2.4 per cent stock.

In connection with your loan, in paragraph one above, you will have the right to also convert that to 2.4 percent of the stock under the same terms and conditions of the stock proposals if you so desire.

If this is your agreement please sign in the area for acceptance below and return a copy to me for my files."

> Best wishes,
> STANDARD RECORD
> PRESSING CO., INC.
> J. D. Tyner, President

Accepted Joe E. Weeks."

At the same time, Tyner signed a note in blank and delivered same to Summerlin with authority to fill in the blanks and deliver to Weeks after Weeks' check to Tyner had cleared the bank. This is the note referred to in the foregoing letter.

For some reason not stated in the record, the post-dated check was deposited prematurely. When Weeks learned of this, he stopped payment on the check, and same was never paid. Summerlin did not fill in the blanks of the Tyner note or deliver it to Weeks at that time, but Summerlin continued to hold the blank note in his file.

In his testimony, Tyner insists that his arrangement with Summerlin and any authority of Summerlin to act for Standard terminated on April 5, 1969, by the expiration of the agreed 30 day period. Summerlin insists that his authority continued after April 5, and that authority included the power to retain the blank note of Tyner and to utilize it as he subsequently did; but this insistence is a conclusion, and is not based upon any further communications between Tyner and Summerlin.

About three weeks before April 15, which would be about March 24, Summerlin "went on a vacation." Be-

fore Summerlin returned from his vacation, Tyner entered a hospital as a result of a heart attack on April 17, 1969.

On April 18, 1969, Tyner dictated at the hospital and signed the following letter:

April 18, 1969

"Dear Mr. Summerlin:

I am very sorry indeed that I was unable to be available when you were in Nashville, Monday, April 14; however, I had instructed Frank Oakley to represent me.

According to my contract of March 5, our agreement is up April 19, and I consider the contract as being unfilled from your standpoint. As you realize, the loan was to be taken from the Third National Bank and we were to receive $260,000.00 from other sources.

I just want to thank you for our past business experience and hope that some future date we can meet when we do not have business on our minds.

Yours very truly,<br>STANDARD RECORD<br>PRESSING CO., Inc.<br>J. D. Tyner, President"

Meanwhile, on or about April 14, 1969, Summerlin induced Weeks to procure a cashier's check in the amount of $7,300.00 and to forward same to Frank Oakley in Nashville for delivery to Summerlin. Weeks testified that the check was sent under a distinct understanding that it would be received and held by Summerlin in escrow, to be made a part of a $230,000.00 financing pack-

age for Standard, and to be returned to Weeks with interest if the $230,000.00 were not raised in 60 days.

On April 15, 1969, before receiving the cashier's check, Summerlin delivered the following letter to Oakley:

April 15, 1969

"Dear Mr. Weeks:

Pursuant to Mr. Frank Oakley's request by phone last night that I would give you this letter which is to assure you that I will put the proceeds of your $7300 check in my special account.

These funds will be used in connection with the securing of the private placement stock and/or loan for the Standard Record Pressing Company.

You have been previously given a letter by Mr. J. D. Tyner which I understand is still in force and effect.

The proceeds of your $7300 check are to stay in my account for a period of 60 days unless by other agreements in writing by us.

I have made two copies of this letter so that you may retain the original, and return the copy to me along with your check."

Sincerely yours,
William J. Summerlin

Accepted this *16th* day of *April 1969*

*Frank Oakley*

Witness my hand and official seal at Nashville, Tennessee, this the 16 day of April 1969

John W. Greenwood

My Commission Expires August 15, 1972
Witness: Jean Oakley''

Both Frank and Jean Oakley testified that, after the receipt by them of said letter, and before the delivery of the cashier's check to Summerlin, there was an oral conversation in which Summerlin agreed unconditionally to the original terms; i. e., that he was to hold the $7,300.00 in escrow for 60 days and return with interest unless $230,000.00 had been raised for Standard.

Having received said $7,300.00 cashier's check from Oakley, Summerlin wrote a further letter to Weeks, as follows:

April 15, 1969

''Dear Mr. Weeks:

Pursuant to Mr. Frank Oakley's request by phone last night that I would give you this letter which is to assure you that I will put the proceeds of your $7300 check in my special account for the Standard Record Pressing Company.

These funds are being used in connection with the securing of the stock options of the Standard Record Pressing Company.

You have been previously given a letter by Mr. J. D. Tyner which is in force and effect, and Mr. Tyner has signed a note covering these funds redeemable in 60 days at 8% interest.

Unless stock has been issued to you by June 15th, and upon your demand, these funds will be returned by Mr. Tyner through me.

With best wishes,

Sincerely yours,
William J. Summerlin

Accepted 4-19-69
Joe E. Weeks''

Weeks admitted that he wrote at the bottom of the letter, "accepted 4-19-69, Joe E. Weeks," but Weeks testified that his oral agreement with Summerlin was not changed or superseded by the letter, and that Summerlin assured him that he had $20,000 from Tyner to be used "in connection with securing private placement stock and/or loan for the Standard Record Pressing Co."

The $7,300.00 cashier's check was deposited to the credit of "William Summerlin Special," however, as a result of the dishonor of the $17,500.00 check from Standard, Summerlin became overdrawn in his regular checking account and transferred the $7,300.00 from the "William Summerlin, Special" account to his personal account. The date of this transfer is not shown.

Other than the proposed arrangement with Maloney and Third National Bank, which was not carried out, and the $7,300.00 secured from Weeks, Summerlin never produced any financing for Standard.

After the expiration of 60 days, Weeks began to seek the agreed refund of his money; but, according to Weeks, Summerlin avoided and evaded him. On one occasion,

at about noon, Summerlin told Weeks to wait in his office while he (Summerlin), went to the rest room. Weeks waited until 4:00 P.M. but Summerlin never returned. Summerlin's explanation of this unusual behavior is that he had to attend a surprise birthday party in his honor.

On another occasion, Summerlin told Weeks he had mailed him a check and showed Weeks a purported stub of the alleged check which, incidentally, was never received by Weeks. Summerlin's explanation of this incident was that he was "tired of it."

During August or September, 1969, Summerlin removed the blank Tyner note from his file, filled in the blanks and mailed it to Weeks.

Summerlin now contends that the delivery of said note to Weeks should satisfy the claim of Weeks. To the contrary, both Weeks and Tyner insist that no consideration for the note had ever passed; that the authority of Summerlin to fill in and deliver the note had never come into being because the first (postdated) check of Weeks was never honored; that any general authority to deal with the note had expired or had been cancelled before Summerlin filled in the blanks and sent the note to Weeks; and that Weeks has no rights, and claims no rights, under said note.

On appeal, the principal contention of Summerlin is that he was at all times acting as agent for a disclosed principal, Standard, that he received the $7,300.00 as agent for Standard, and that he is not liable upon the contract of a disclosed principal for whom he was acting.

An agent, dealing for a disclosed principal within the scope of his powers, is not personally liable, unless the

third party gave credit exclusively to him and it was his intention to become personally liable. Siler v. Perkins, 126 Tenn. 380, 149 S.W. 1060 (1912).

█ If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone unless credit has been given expressly and conclusively to the agent, and it appears that it was clearly his intention to assume the obligation and he was informed that credit was extended to him alone. Hammond v. Herbert Hood Co., 31 Tenn.App. 683, 221 S.W.2d 98 (1948).

Where, however, the contract contains apt words to bind the agent personally, the agent may be held liable directly upon the contract. Cumberland Portland Cement Co. v. R.F.C., D.C. 140 F.Supp. 739, affirmed 232 F.2d 930 (6th Cir. 1956).

If the credit is given to the agent, the agent is liable. Powell v. Finch, 13 Tenn. 446 (1830).

Whether an agent, dealing for a disclosed principal, binds himself depends on the intention of the parties, and it is the disclosed intention, and not some hidden intention, that governs. Siler v. Perkins, supra.

In 3 C.J.S. Agency sec. 217, p. 128, is found the following:

"*Misappropriation of fund by agent.* A third person who pays money to the agent of another, to apply on an indebtedness or obligation owed the principal, has no right of action for its return against the agent, although the latter fails to transfer the money to the principal and misappropriates it to his own use, for the obligation of the payer to the principal has been satis-

fied to the extent of the amount paid and the sole right to the money is in the principal; but if the third person pays the money to the agent, not to apply on a prior indebtedness to the principal but to create a contract obligation with the principal, and the agent diverts or misappropriates the funds received, the payer may hold him personally liable, even though he may have a claim against the principal.''

In Conness v. Baird (Tex.Civ.App.) 124 S.W. 113 (1909) it was held that an agent holding earnest money to be paid to his principal on the performance of a sales agreement is liable to the depositor thereof where he pays it over before the condition is performed.

In Jensen v. Miller, 162 Wis. 546, 156 N.W. 1010 (1916) it was held that where an agent received and retained money as the cash payment in consideration of a contract to convey land, on failure of his principal to convey title as agreed, the agent was liable to the purchaser for refund of the money. To the same effect is Lurz v. John J. Thompson & Co., 86 Ga.App. 295, 71 S.E. 2d 675 (1952).

The chancellor found for complainant, which means that he resolved all necessary issues of fact in favor of complainant.

If there is any theory of facts upon which the decree may be sustained, it must be done. Chappell v. Chappell, 37 Tenn.App. 242, 251, 261 S.W.2d 824 (1952).

█ In cases tried in equity upon oral testimony without a jury, the decision of the chancellor as to the credibility of witnesses is final and not subject to review in the appellate courts. Hull v. Evans, 59 Tenn.App. 193, 439 S.W.2d 110 (1968) and authorities cited therein.

The judgment of the chancellor comes to this Court for review de novo upon the record, but accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. T.C.A., sec. 27-303.

The preponderance of the evidence, summarized above, supports a finding that:

(a) The term of employment of Summerlin as agent for Standard was for 30 days from March 5, 1969, expiring on April 4, 1969.

(b) The consideration named in Tyner's letter of March 13, 1969, supra, never materialized because the "contract" mentioned therein was never signed by Mr. Maloney.

(c) The contract between Summerlin and Tyner (Standard) was never fulfilled by Summerlin.

(d) The transaction involving the first (postdated) check for $7,300.00 and the blank note was never consummated, but was abandoned by the parties.

(e) The second (cashier's) check for $7,300.00 was in fact delivered to and accepted by Summerlin upon oral conditions as insisted by Weeks and Oakley in spite of the cleverly worded letters and written assent thereto by Oakley or Weeks.

(f) The "funds" ($7,300.00 cashier's check) were not used "in connection with the securing" of stock options or loans for Standard, as promised in Summerlin's said letters, quoted supra, but said funds were wrongfully converted to Summerlin's personal use upon the pretext of replacing funds lost by a dishonored check of Standard.

(g) Stock was not issued to Weeks by June 15, as promised in Summerlin's letter, quoted supra.

Under the foregoing facts, which this Court finds from the evidence, the defendant Summerlin is obligated to refund the said $7,300.00 to complainant with interest at 6% from April 15, 1969 as agreed.

Since the chancellor allowed interest only from the filing of the bill, a decree will be entered in this Court in favor of complainant-appellee, J. E. Weeks, and against the defendant-appellant, W. J. Summerlin, in the amount of $7,300.00 plus 6% interest thereon from April 15, 1969, and all costs including costs of this appeal.

Modified and affirmed.

Shriver, P. J. (M.S.), and Puryear, J., concur.