V. L. NICHOLSON COMPANY,
Petitioner,

v.

TRANSCON INVESTMENT AND
FINANCIAL LTD., INC. et al.,
Respondents.

Supreme Court of Tennessee.

Feb. 19, 1980.

Wheeler A. Rosenbalm, W. Morris Kizer, Frantz, McConnell & Seymour, Knoxville, for petitioner.

William G. Cockrill, McCord & Cockrill, P.C., Knoxville, for respondents.

## OPINION

HENRY, Justice.

This contract action involves the development and construction of federally subsi-

dized low-rent housing in Johnson City. The parties seek damages for alleged breaches of their respective contractual obligations. The trial court awarded the V. L. Nicholson Company (contractor) a judgment against Transcon Investment and Financial, Ltd., (developer) and dismissed Nicholson's complaint against Johnson City Leased Housing Corporation (owner), characterizing the latter as a "creature and vehicle of Transcon." Nicholson appeals from a judgment rendered by the Court of Appeals against it and in favor of Transcon and Johnson City Leased Housing Corporation.

## I.

### A. *The Parties and the Contract*

Petitioner, V. L. Nicholson Company, is a Tennessee corporation doing business as a general building construction contractor. Respondent, Transcon Investment and Financial, Ltd., Inc., also a Tennessee corporation, is in the business of real estate development. Transcon promotes and develops public housing projects throughout the southeastern United States.

Respondent, Johnson City Leased Housing Corporation, is a Tennessee not-for-profit corporation which presently owns the land and one hundred units of housing which are involved in this lawsuit. This property is presently leased to Johnson City Housing Authority.

In 1971, the United States Department of Housing and Urban Development (HUD) approved the construction of one hundred low-rent housing units to be constructed as a "leased housing project" by the Johnson City Housing Authority. This project was to be built under Section 23 of the United States Housing Act of 1937, as amended, with the Federal Housing Authority guarantee of a portion of all the rent if the housing met requirements and standards promulgated by HUD.

In May 1972, the Johnson City Housing Authority issued a letter of intent naming Transcon as project developer. Transcon (or Transcon's attorney) set up the Johnson City Leased Housing Corporation (JCLHC) to finance, construct and own the property. JCLHC's charter characterizes it as an agency and instrumentality of the Johnson City Housing Authority. The creation of JCLHC served several purposes: To facilitate the issuing of tax-exempt revenue bonds in the principal amount of $1,480,-000.00, to purchase the land and to lease the completed project to Johnson City Housing Authority. The Commerce Union Bank of Nashville handled the details of financing the project.

As promoter and developer, Transcon selected for the project the architectural firm, Ost, Follis, Wagner and Bekemeyer of Memphis, and the general contractor, Nicholson. Transcon was involved in the negotiations which were conducted primarily between Nicholson and Bob Beeler, a hardware salesman known to both Nicholson and Transcon. The original contract was between JCLHC (owner) and Nicholson (contractor); Transcon was not a party signatory to the contract. The contract was drawn on May 15, 1973, based on plans and specifications which were later discovered to be preliminary and incomplete. The price of the contract was set at $1,115,-000.00.

This contract, executed by JCLHC, was delivered to Nicholson on May 23, 1973, by Bob Beeler, along with an unsigned addendum. That same day Nicholson sent to Transcon the executed contract and a letter stating that Nicholson's acceptance of the contract was conditioned upon the acceptance of certain conditions, including the addendum to the specifications. The addendum and eight (8) conditions contained in the letter incorporated changes made during the negotiations which Nicholson found not reflected in the contract. Transcon acknowledged receipt of the contract and in reply told Nicholson to proceed. Nicholson refused to proceed with the work until the letter, with its conditions and addendum, was accepted. Transcon wired acceptance on June 14, 1973, stating that the addendum and conditions were "between Transcon and V. L. Nicholson Company." Trans-

con also stated in the telegram that completion date would be nine months after start and "[a]djustment will be made for any delays to this time between Transcon and Nicholson." JCLHC was not involved in acceptance of the conditions and addendum.

Nicholson received revised plans on or about July 30, 1973, a month after the original start date set out in the contract. The revisions reflected additions necessitated by HUD specifications and contained many items eliminated during the negotiations preceding the contract. Nicholson replied that the revisions were not those contemplated. Finally it was agreed between Nicholson and architect Bekemeyer that the additional items and the revisions would be incorporated into written change orders to be submitted for approval.

The original contract was a standard form contract of the American Institute of Architects. It set commencement day as June 1, 1973, and completion day as February 15, 1974. It contained clauses on change orders and liquidated damages. The addendum to the contract adjusted the completion date to nine months after the building permit could be obtained. All change orders were to be written and approved by the owner and the architect, or by the architect alone if the architect had written authority from the owner for that procedure. The liquidated damages clause provided that should the project not be completed on time the contractor would pay liquidated damages estimated at approximately $350.00 per day for every day past completion. Final payment was conditioned upon approval by the owner, the Johnson City Housing Authority and HUD.

Revised plans were sent to HUD for approval on July 25th and then on to Nicholson on July 30th. Further revisions were received by Nicholson on August 6th. These revisions brought the contract in line with HUD standards and changed the scope of the work defined in the May 23rd contract. For the purpose of discussing the differences between the original contract and the revised plans and specifications, a meeting was held on August 9, 1973, with Nicholson, Transcon's vice-president, Erlewood Barden, and the project architect, Bekemeyer. Bekemeyer agreed that several items in the revisions had been in the project as it was originally drawn, but were negotiated out prior to the execution of the contract. Bekemeyer explained these items would have to be included because they were required by HUD. Bekemeyer agreed to send revised plans as soon as they were completed. By the end of August 1973, things were to the point that Nicholson could begin site work but by early September Nicholson once again stopped because, according to Nicholson, extra work had not been approved. Transcon instructed Bekemeyer to work out the problems with Nicholson.

Thus, in a meeting on September 14th, between Bekemeyer and Nicholson, the architect directed Nicholson to submit change orders. The eight change orders in dispute in this case were prepared by Nicholson and were submitted between September 18 and December 18, 1973, but were never approved by either JCLHC, as required by the contract, or by Transcon with whom Nicholson continued to deal.[1] Work did proceed, however, based upon the change orders. These change orders eventually resulted in cost overruns and/or additional charges and increased the number of work days needed to complete the project.

Under its development contract with JCLHC, Transcon was authorized to make progress payments. Transcon, in turn, authorized its vice-president, Barden, to execute progress payments to Nicholson, which Barden did several times in the course of the work, at least up through June 1974. Not included in these payments was any amount for the "extra" work being done by Nicholson; on the applications for payment Transcon marked these "subject to review."

After completion of the project, JCLHC or Transcon continued not to pay for the extra work described in the change orders and did not release the contract retainage.

---

1. One change order, submitted much later, was approved by Transcon. Transcon paid Nicholson $34,000.00 for additional work performed after September 27, 1974.

In February 1975, JCLHC and Transcon executed an "Assignment and Hold Harmless Agreement." In the agreement JCLHC assigned to Transcon its "right to sue Nicholson for damages under the construction contract." Transcon in return agreed to defend and hold JCLHC harmless against any claims made by Nicholson.

On February 18, 1975, Nicholson filed a lien against the housing units to secure payment for the extra work done.

### B. *The Trial Court*

The trial court entered a judgment for Nicholson against Transcon, consisting of $70,991.00 in payment for extra work beyond the requirements of the contract, and $23,420.00, the unreleased retainage. The Trial Judge characterized JCLHC as a "creature and vehicle of Transcon." He held that the letter of May 23 by Nicholson to Transcon was an addition to the original contract and that Transcon's knowledge of and lack of protest of the extra work of Nicholson amounted to an implied promise to pay a reasonable sum for the work performed. The Trial Judge also found that the change orders were valid because the architect acted as Transcon's agent with apparent authority to bind Transcon. The complaint against the Johnson City Housing Authority, the Bank and JCLHC was dismissed. The Trial Judge also discharged Nicholson's writ of attachment on JCLHC's property because of the federal nature of the property.

The counterclaim of JCLHC against Nicholson and Maryland Casualty, surety for Nicholson, for liquidated damages was dismissed. The trial court found that both Transcon and Nicholson were responsible for delays and that equity prevented enforcement of the forfeiture.

### C. *The Court of Appeals*

In perfecting its appeal of the trial court's judgment, Transcon filed a notice of cash deposit in lieu of cost bond, stating that $693.50 had been lodged to cover costs. Very shortly thereafter, Transcon filed a pauper's oath in lieu of an appeal bond.

Nicholson objected and filed a motion to dismiss Transcon's appeal. Nicholson also filed a motion to dismiss JCLHC's appeal, alleging that JCLHC had not prayed an appeal, and thus, none had been granted on its counterclaim.

Nicholson's motion to dismiss Transcon was denied. The Court thus allowed Transcon to appeal on a pauper's oath, finding nothing in Sections 27–313, 27–315 or 20–1629, T.C.A., which precluded such an appeal. Although no ruling was made on the motion to dismiss JCLHC's appeal, the Court of Appeals did reverse the dismissal of JCLHC's counterclaim.

The Court of Appeals modified Nicholson's judgment, allowing the return of the retainage but disallowing any recovery for "extra work." The Court found that the additional work was extraneous to the contract and that there was not a contractual relationship between Transcon and Nicholson on which a recovery from Transcon could be based. Because the change orders for the additional work were not approved by JCLHC, no basis for recovery existed between those two parties.

The Court of Appeals did not reach the question of whether the Chancellor had correctly refused to allow a lien on JCLHC's property in favor of Nicholson.

Judgment was granted on JCLHC's counterclaim for liquidated damages against Nicholson, in the amount of $21,000.00. The liquidated damages award represented sixty days of delay attributable to Nicholson.

### II.

Petitioner Nicholson assigned several errors in the Court of Appeals. First Nicholson asserted that the Court of Appeals erred in overruling its motion to dismiss Transcon's appeal. The crux of this assignment of error is the question of whether a corporation may file a pauper's oath in lieu of an appeal bond. Section 27–313, T.C.A., requires that where decrees are for a specific sum of money and against the party in his own right, then the appeal bond must be

for the amount of the decree and the damages and the costs. Such was the case here. Transcon, through its Chairman of the Board, Z. D. Moses, filed a pauper's oath in lieu of an appeal bond, stating that owing to the corporation's financial condition and lack of unencumbered assets, the corporation was unable to make bond for the appeal. It also stated in its pauper's oath that the corporation is a Tennessee corporation with its principal offices in Shelby County and that the corporation is entitled to the relief sought.

In *Diversified Equities, Inc. v. Warren*, 567 S.W.2d 171 (Tenn.App.1976), the Court of Appeals for the Middle Section faced this question squarely. It held that the corporation was not entitled to appeal on a pauper's oath under Section 20–1629, T.C.A. The Court of Appeals reasoned that because the oath in Section 20–1629, T.C.A., uses the word "I" throughout, that the use of the pauper's oath is therefore restricted to natural persons, and because the corporation is an artificial entity it would not fall in this category.

We reach the conclusion that the corporation may appeal upon a pauper's oath and hereby overrule *Diversified Equities, Inc.,* *supra.*

■ Except for false imprisonment, malicious prosecution, slanderous words, and a case for absolute divorce, any resident of the state may file a pauper's oath by swearing to his or her poverty and inability to bear the expense of the action. Section 20–1629, T.C.A. This applies not only to the commencement of an action, but also to appeals. *See* Section 27–312, T.C.A.; *see, e. g., Hewell v. Cherry*, 25 Tenn.App. 420, 158 S.W.2d 370 (1941).

The statute does not, by its language, prohibit a corporation from filing a pauper's oath. It remains then to discover whether the corporation meets the requirements of the statute as a whole.

■ While the words "any resident" might be construed as contemplating a natural person, there is no reason to construe the words as excluding a corporation which is a resident of the state. We think the better practice would be to extend to an insolvent corporation this opportunity to pursue a meritorious appeal. For the purposes of the Rules of Civil Procedure, a corporation is a resident where it maintains an office or an agency or a resident director. *Redman v. Dupont Rayon Co.*, 165 Tenn. 585, 56 S.W.2d 737 (1932). Transcon is a Tennessee corporation and a resident of this state; it affirmatively stated this fact in the pauper's oath it filed. Therefore, Transcon qualifies under that portion of the statute that requires that the pauper's oath be filed by a resident of the state.

■ The next requirement is that the resident must take a solemn oath swearing to his or her poverty and inability to bear the expense of the action. The trial court has the full authority to hear testimony on the sufficiency of such a bond under Section 27–317, T.C.A. The pauper's oath filed by Transcon does not follow the wording provided in the statute.[2] It does, however, allege inability to make the bond for an appeal and is more specific and precise than the wording from the statute, for the pauper's oath filed on behalf of Transcon states that the corporation, due to its financial condition and lack of unencumbered assets, does not have the ability to make the bond. There was no challenge to the actual wording of the pauper's oath; we find that it was legally sufficient. Better practice requires that when a corporation files a pauper's oath it state as specifically as possible its reasons for its inability to bear the costs of the action. Further, it is entirely possible in those cases where the statute requires bond for the full amount of the judgment, that the corporate entity, while unable to procure bond for the entire amount, may partially bond the judgment, resulting in an

---

2. Section 20–1629, T.C.A., reads, in pertinent part, as follows:

"I, A B, do solemnly swear, that, owing to my poverty, I am not able to bear the expense of the action which I am about to commence, and that I am justly entitled to the relief sought, to the best of my belief."

appeal bond, in part, and resting on the pauper's oath in part. This type of situation should be resolved in the trial court.

The remaining requirement for filing the pauper's oath is that the affidavit or oath should state that the person or resident filing is justly entitled to the redress sought. Section 20–1629, T.C.A. The pauper's oath filed on behalf of Transcon meets this requirement.

■ We hold then that a corporation which is a resident of this state and which meets the other requirements of Section 20–1629, T.C.A.,[3] may file the pauper's oath. We find that Transcon as a resident of this state, has met these requirements. This assignment of error by Nicholson is overruled.

### III.

■ Nicholson next assigns as error the Court of Appeals' failure to consider and sustain Nicholson's motion to dismiss the appeal of JCLHC. Nicholson maintains that JCLHC did not pray for and was not granted an appeal and that it did not file an appeal bond.

We need not address this issue at length. In February 1975, JCLHC and Transcon executed an "Assignment and Hold Harmless Agreement." Assuming that this assignment is valid, and we have no reason to believe otherwise, Transcon has the right to assert JCLHC's claim as a counter-plaintiff and to appeal the dismissal of it. *See* Rule 17.01, Tenn.R.Civ.P. It is therefore not necessary for us to determine whether JCLHC perfected its appeal.

### IV.

#### A. *General*

Two errors assigned by Nicholson encompass the major question we face in the case at bar. Nicholson assigns as errors the Court of Appeals' failure to hold Transcon and JCLHC liable for the work extraneous to its contract which it performed with the knowledge of Transcon.

Several facts related to this question are not disputed. First, there was an express contract between JCLHC and Nicholson, and that contract did not contain specific directions for the work for which Nicholson now claims payment. The named parties to this express contract were JCLHC and Nicholson. Nowhere does Transcon's name appear in the contract. Transcon, by telegram, did approve the conditions and addendum in reply to Nicholson's letter of May 23rd. The express contract required that change orders be in writing and approved by the owner, or the architect if he had such authority. Nicholson did submit written change orders to Transcon for the extra work performed, and there is no evidence in the record to show that these change orders were ever approved in writing by either JCLHC or Transcon.

Transcon was responsible, as the developer of the project, for securing a contractor for the project and was involved in negotiations on the contract after Nicholson was selected. Transcon similarly selected the architect for the project and continued to deal with him while the building was in progress, hence its direction to the architect to "work things out" with Nicholson over the disputes as to what work was included in the contract, and hence its letter of November 7, 1974, instructing the architect to "certify that sufficient cause exists for Transcon to terminate employment of V. L. Nicholson Co., Inc., as contractor for the project."

Transcon's connections with JCLHC are less clear, but some things here are also certain. One, Transcon owns no interest in JCLHC, has no legal control over it; there are no common directors, officers or members. Transcon's attorney undertook the legal steps necessary to incorporate JCLHC and to effectuate the issuance of the bonds. Transcon had the authority under its contract with JCLHC to approve progress payments to Nicholson.

---

3. Appeal bonds and related procedures are now governed by Tenn.R.App.P. 62 (effective July 1, 1979).

With this review of the facts we return to the question of who, if anyone, is liable to Nicholson for payment for the work represented by the change orders, for it is not disputed that the work was done and accepted.

B. *The Express Contract*

■ Express contracts are written agreements stating the terms agreed upon by the parties; these terms must be sufficiently definite to be enforced. *See Johnson v. Central National Ins. Co. of Omaha,* 210 Tenn. 24, 356 S.W.2d 277 (1961). Frequently, modifications to a written contract must be in writing to be binding on the parties, but whether written or oral, the modifications must be with the consent of both parties. *See Cronbach v. Aetna Life Ins. Co.,* 153 Tenn. 362, 284 S.W. 72 (1925). Ordinarily those persons named as parties to the contract will be bound by its terms and liable for their breach. *See 17 Am. Jur.2d Contracts* § 294 (1964).

■ Nicholson cannot recover for its extra work under its express contract with JCLHC. JCLHC did not itself accept the conditions and addendum referred to in Nicholson's letter of May 23. The contract specifically required change orders to be approved by the owner; the change orders were not sent to JCLHC; no approval was made by JCLHC. Transcon, which accepted the conditions and revisions in the specifications, was not a named party to the contract. In addition, with the exception of one change order approved and paid by Transcon and not in dispute here, Transcon also did not approve the change orders in writing. Even if Transcon were an agent of JCLHC, it still did not bind JCLHC, for it did not expressly approve any of the change orders for the disputed extra work. The express contract was, therefore, not modified. Nicholson may not recover under the original contract for the extra work.

C. *The Implied-in-Fact Contract*

■ A second basis for recovery is advanced in Nicholson's behalf—the implied-in-fact contract. Generally, an implied contract is one which is inferred from the conduct of the parties; it is not necessarily expressed in words. *Judd v. Heitman,* 402 F.Supp. 929 (M.D.Tenn.1975). A promise will not arise by implication, however, when the circumstances and facts from which the promise would be drawn are contrary or completely inconsistent with the contract to be implied. 17 Am.Jur.2d *Contracts* § 3 (1964). Nor may a contract be implied in fact in the face of a declaration to the contrary by the party to be charged. *Travelers Ins. Co. v. Williams,* 541 S.W.2d 587 (Tenn.1976).

■ If a contract may be implied, then a commitment to pay reasonable compensation is also implied. This promise to pay is implied where a person works for another, with the latter's knowledge, and the work is useful and normally would be compensated and where the person for whom the work is being done does not object or accepts the services rendered. *See, e. g., Murray v. Grissim,* 40 Tenn.App. 246, 290 S.W.2d 888 (1956). Thus a promise to pay will only be implied when the work was performed under circumstances in which a person could reasonably expect to be compensated by the party benefited. The conduct or words of the person who receives the benefit of this work must be such that one could fairly infer a promise to pay. *See, e. g., Nashville Breeko Block and Tile Co. v. Hopton,* 29 Tenn.App. 394, 196 S.W.2d 1010 (1946).

From the circumstances of this case we imply a contract for the extra work performed by Nicholson, and we conclude that both Transcon and JCLHC are liable for the sum owing.

D. *The Liability of Transcon and JCLHC*

■ It is true that Transcon never gave written approval to the change orders from Nicholson and that in its approval of progress payments to Nicholson it never paid for work done on a change order. It is equally true, however, that several aspects of Transcon's conduct are consistent with

an implied promise to pay for the extra work performed by Nicholson. Transcon telegraphed approval and acceptance of Nicholson's conditions and the addendum. It sent its vice-president to a meeting with Nicholson where it was decided that change orders were the necessary route to settle disputes over whether certain work would be done. Transcon had before it written change orders carefully and explicitly detailing the extra work being done. It took no steps to disapprove these change orders or stop the extra work in progress. Quite the contrary, it, as well as all parties involved, was very interested in work progressing to completion. Under these circumstances it is fair to assume Nicholson thought it was doing work for which it would eventually be compensated.

■ In addition, the architect orally approved the extra work. In answer to Transcon's contention that this was not binding because the architect was not an agent of Transcon, we point to Transcon's actions which cloaked the architect with the apparent authority to act in Transcon's behalf, including the meetings with Nicholson and the letter asking the architect to certify sufficient cause to terminate Nicholson.

■ In order to determine whether an agency has been established, the relationship of the parties is scrutinized, and the facts will establish agency whether the parties so intended or understood. *Rich Printing Co. v. McKellar's Estate*, 46 Tenn. App. 444, 330 S.W.2d 361 (Tenn.App.1959). "Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing . . . such authority as a reasonably prudent man, using diligence and discretion, in view of the party's conduct, would naturally suppose the agent to possess." *Id.* at 376. If it can be shown that the plaintiff held the agent out as having such authority or permitted him so to act, and if the person dealing with the agent "knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority," then the general rule on apparent authority may be applied. *Id.*

■ Through Transcon, JCLHC is liable to Nicholson under the implied contract for work performed per the change orders submitted by Nicholson. A principal generally is bound by its agent's acts done in its behalf and within the actual or apparent scope of the agency. *Holloway v. Howerdd*, 377 F.Supp. 754 (M.D.Tenn.1973); *modified on other grounds*, 536 F.2d 690 (6th Cir. 1976). The agent ordinarily does not incur liability unless it is shown that he intended to be personally responsible for his actions. *See, e. g., Weeks v. Summerlin*, 62 Tenn.App. 650, 466 S.W.2d 894 (1970). It could be argued that Transcon assumed such personal liability when it telegraphed its acceptance of the contract conditions and addendum, *see* Section I, *supra*. We need not, however, answer this question of Transcon's liability under principles of agency law, for Transcon has indemnified JCLHC in its "Assignment and Hold Harmless Agreement," and JCLHC definitely is liable.

Just as Transcon's conduct created apparent authority in architect Bekemeyer to act on its behalf, so also did JCLHC act in a manner which created apparent authority in Transcon to act in its behalf. JCLHC involved Transcon in the progress payments to Nicholson. The power to approve or disapprove Nicholson's work necessarily inheres in Transcon's authority to approve progress payments. In addition, JCLHC appears to have acquiesced in Transcon's maintaining contact with and generally directing, through the architect, the project overall. Unlike the Court of Appeals, we are not surprised that "Nicholson somehow strangely assumed (in light of the contract) that Transcon had an authoritative interest in the project." Transcon was a part of this project throughout. JCLHC appears not to have been active in the actual direction of the project; it obviously accepted the benefits, however, of the work performed. By creating a situation in which a reasonable person would be justified in his assumption that Transcon could act for JCLHC, JCLHC created apparent authority in Transcon, and

as its principal is liable for its agent's actions.

### V.

Next Nicholson poses the question of whether the Court of Appeals erred in granting JCLHC a judgment against Nicholson for liquidated damages.

The term "liquidated damages" means a sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur. 22 Am.Jur. *Damages* § 212 (1965). *See Railroad v. Cabinet Co.*, 104 Tenn. 568, 58 S.W. 303 (1900). The reason for allowing parties to stipulate the amount of damages is to create certainty where damages are likely to be uncertain and not easily proven. *Railroad v. Cabinet Co., supra.* The amount stipulated should be reasonable in relation to the terms of the contract and the certainty with which damages can be measured; there must exist a reasonable relationship between the amount and what might reasonably be expected in the event of a breach. *Id.* If the provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages. *See City of Bristol v. Bostwick*, 146 Tenn. 205, 240 S.W. 774 (1921); 22 Am.Jur. *Damages* § 227 (1965). A party will not be allowed, however, to recover liquidated damages where he is responsible for or has contributed to the delay or nonperformance alleged as breach. *Glassman Construction Co., Inc. v. Maryland City Plaza, Inc.*, 371 F.Supp. 1154 (D.C.Md.1974), *aff'd*, 530 F.2d 968 (4th Cir. 1975).

JCLHC cannot recover liquidated damages from Nicholson. The contract as originally drafted contemplated a starting date of June 1, 1973, and a completion date of February 15, 1974. The actual date on which the project was turned over was February 19, 1975. Several factors contributed to this delay. Neither party adheres to the original starting date but both seem to agree that the actual starting date for pur-

poses of the express contract was August 29, 1973, with a requirement that completion be within nine months. The work done between September 27, 1974, and February 19, 1975, was paid for by their one approval of a change order. If then September 27 were designated as the completion date of the project for which the original contract was drawn, Nicholson exceeded the time allotted by two months. In addition, the time period was increased by the architect's allowance of an additional 59 days to complete work under the change orders he orally approved. It appears also that time was lost on the project by Nicholson's difficulties in obtaining a building permit because of a sewer tap fee. No matter how one juggles the dates and time allowances the courts below found, and we agree, that both Nicholson and Transcon contributed to the delay. While the liquidated damage clause was otherwise enforceable, as it contemplated an amount reasonably related to damages JCLHC would have suffered if the completion date were not met, we cannot enforce such a provision where both parties have mutually caused the delay. *See Glassman Construction Co., Inc., supra.*

### VI.

Finally, Nicholson assigns as error the trial court's failure to hold that Nicholson was entitled to a lien against or upon the property of JCLHC. Due to the public character of the property against which the lien would attach, we agree that Nicholson should not be allowed a lien against JCLHC's property under Section 64–1102, T.C.A.

Pursuant to Section 64–1102, T.C.A., a lien may be obtained against any tract of land upon which a structure has been erected in favor of the person doing the work and/or furnishing the materials. The person seeking the lien must give notice. *Conger Lumber and Supply Co. v. White*, 17 Tenn.App. 206, 66 S.W.2d 999 (1933); Section 64–1115, T.C.A. A lien may not, however, attach to public property or improvements on public property for rea-

sons of public policy. *See Tennessee Supply Co. v. Young*, 142 Tenn. 142, 218 S.W. 225 (1919); *Air Temperature Inc. v. Morris*, 63 Tenn.App. 90, 469 S.W.2d 495 (1971). In other jurisdictions also, liens have been disallowed on property of state or local government and on the property of housing authorities. *See, e. g., Phillips v. University of Virginia*, 97 Va. 472, 34 S.E. 66 (1899); *Ferch v. Housing Authority of Cass County*, 79 N.D. 764, 59 N.W.2d 849 (1953).

■■■ Nicholson maintains that because JCLHC is a private not-for-profit corporation and because the financial support contributed by the federal government to this project is minimal compared to the total cost of the project as represented by the bonds issued, that this property is private and a lien may attach. We disagree.

This housing was designated as a project under Section 23 of the United States Housing Act of 1937 which provides for the leasing of housing units from private owners. JCLHC is not, however, a wholly private enterprise, any more than this property can be considered private for the purpose of imposing this statutory lien. The housing project exists for the purpose of providing low-cost, low-rent public housing, and JCLHC's charter reflects that it was organized to help attain this goal. Further, in the charter, it is stated that JCLHC is to act as an agency and instrumentality of Johnson City Housing Authority. Title to the property will vest in the Housing Authority, upon its request, when JCLHC has discharged its indebtedness incurred in issuing bonds. The overall character of this property is public, and it deserves the protection against liens and encumbrances which our public policy promotes.

We affirm so much of the opinion of the Court of Appeals which allows a corporation to appeal on a pauper's oath pursuant to Section 20–1629, T.C.A. In addition we hold that JCLHC's appeal was properly before the Court. We reverse the Court of Appeals on its denial of recovery by Nicholson against JCLHC and Transcon and reinstate the trial court's award to Nicholson but modify the trial court's decision so as to include JCLHC as a party liable on the implied contract. The Court of Appeals' award of liquidated damages to JCLHC is reversed. The trial court's denial of Nicholson's statutory lien on JCLHC's property is affirmed.

Reversed in part; affirmed in part.

BROCK, C. J., and FONES, COOPER and HARBISON, JJ., concur.