James B. McGANN and wife Estelle McGann, Plaintiffs-Appellees,

v.

UNITED SAFARI, INC., Defendant-Appellant,

and

Business Brokers, Inc., Defendant-Appellee.

Court of Appeals of Tennessee, Western Section, at Knoxville.

March 19, 1985.

Application for Permission to Appeal Denied June 3, 1985.

John B. Waters, III, Knoxville, for plaintiffs-appellees.

W. Dale Amburn, Knoxville, for defendant-appellant.

J. Douglas Overbey, Knoxville, for defendant-appellee.

CRAWFORD, Judge.

In this non-jury case, United Safari, Inc. (Safari), has appealed from the judgment of the trial court denying it recovery for royalty payments due under a license or franchise agreement. The license agreement in question, dated February 1, 1976 and due to run for a term of ten years, was originally between United Safari International, Inc., as the licensor and Wanda and Karl Barnett, licensees. It authorized the licensees to operate a camping resort at Pigeon Forge, Tennessee under the Safari national system of franchised camping resorts. The agreement also stated that no additional Safari campground would be located within fifteen miles thereof.

The Barnetts sold the campground at Pigeon Forge to James B. McGann and wife Estelle McGann (hereinafter McGann or licensees) and the license agreement was assigned to the McGanns effective April 10, 1979. The original licensor, United Safari International, Inc., sold its franchise or license business to United Safari, Inc., in March, 1981.[1] For simplification the licensor is referred to herein as Safari and the licensee as McGann.

After acquiring the Pigeon Forge campground in April, 1979, McGann operated under the agreement and paid royalties through December, 1980. In June, 1982, Safari filed suit in Wisconsin against McGann seeking to collect the royalties due under the license agreement. McGann filed the present suit in November, 1982, seeking damages for breach of the license agreement by Safari. Safari counter-

---

1. Subsequently United Safari International, Inc., changed its name to Business Brokers, Inc.

claimed for the royalties due and the Wisconsin lawsuit was stayed pending disposition of this case. Safari also filed suit against Business Brokers alleging, in the alternative, a breach of their agreement by Business Brokers concerning the status of the license agreement sold under the agreement.

Paragraph 4(b) of the license agreement obligates Safari to perform various services for the licensee in return for which the licensee is, according to Paragraph 3(c),

[t]o pay SAFARI as compensation for services to be rendered by SAFARI as provided in section 4(b) hereof, a continuing service fee of 7% of total camper registration fees.... At such time as the remittances paid to SAFARI shall have reached $3,500.00 in any given one year period the service fee shall be reduced for that year from 7% to 3.5% of total camper fees (only). At such time as the remittances paid to SAFARI have reached $5,250.00, no further remittance will be due for that same year. The continuing service fee shall, in this manner, not exceed $5,250.00 during any single Calendar year.

McGann does not contend that Safari failed to perform the services provided for in § 4(b) of the agreement. However, McGann asserted in the trial court that Safari breached the agreement in two particulars—(1) by licensing another campground, Gateway, within a fifteen mile radius of Pigeon Forge, and (2) in allowing substandard conditions to exist at Gateway.

As to the first alleged breach the trial proof established and the chancellor found that McGann had waived the provision of the agreement prohibiting the licensing of another campground within a fifteen mile radius. McGann does not assail this finding on appeal.

As to the second alleged breach the chancellor found that Safari breached the terms and conditions of the license agreement by failing to properly oversee the operation, maintenance, conditions and upkeep of other Safari campgrounds and that, therefore,

McGann was justified in terminating the agreement and his obligation for further royalty payments. The chancellor further found that McGann failed to prove any damages resulting from the breach by Safari and held that neither party could recover from the other.

The issue presented for review is whether the chancellor correctly found that Safari breached the license agreement with McGann and that such breach terminated any liability of McGann for royalty payments thereunder.

In Paragraph 3 of the license agreement the licensee agrees, inter alia:

(g) To provide services, comforts, and necessities to campers without additional charge to the camper and all to be in accordance with standards established from time to time by SAFARI for all its licensed locations so that each camping resort helps to create good will among the public for SAFARI as a whole and that Licensor and all Licensees are therefore benefited.

McGann asserts that the importance of this undertaking by licensees is emphasized by the philosophy expressed in the agreement as follows:

*Recitals*

SAFARI has established a national system of franchised camping resorts to furnish the camper with clean, comfortable camping accommodations and facilities. The primary objective of the SAFARI system is to provide the camping public with service and facilities which are both excellent and uniform throughout the entire system. The success of the system depends upon the continued good will of the public toward the name SAFARI and in order to maintain this good will, it is essential that SAFARI and the various licensees within the system adhere strictly to their obligations stated in their respective license agreements.

Notwithstanding the provisions of the license agreement, McGann contends that Safari breached the agreement by allowing

substandard conditions to exist at the Gateway Campground which resulted in a loss of business to his campground. McGann asserts that Safari's breach of the agreement relieves him of further obligation for royalty payments.

We will briefly review the testimony regarding the issue presented for review:

McGann testified that late in 1980 he had received complaints from his campers about conditions at Gateway and that he had inspected Gateway in response to these complaints. He indicated that he had found the bathrooms "very nasty." He stated further that the photographs he made in early September, 1982, after Safari instituted the Wisconsin lawsuit, accurately depicted the conditions as they had existed at the time of his 1980 visit. On cross-examination he admitted that an independent campers' guide had rated the facilities at Gateway as a "three" and those at Pigeon Forge as a "four" in its 1981–82 catalog.

McGann then related how he had stopped paying franchise fees in December, 1980, and had admittedly been slow to explain his reasons for doing so to Safari. He claimed that the licensing agreement had been mutually terminated in June, 1981, when, in a conversation with the Safari president, Chouinard, the latter had acknowledged that Safari had an obligation to correct deficiencies at other campgrounds after owners' complaints were received. McGann admitted, however, that the president told him in the same conversation that conditions at Gateway were not serious enough to warrant Safari's cancellation of their agreement.

Continuing his testimony, McGann admitted he had used the Safari name in advertisements during 1981 and 1982. However, he testified that the advertising had continued because he had already accepted many advanced reservations for World's Fair campers and if he had ceased identifying his business as a Safari campground, campers intending to use their reservations would not have been able to locate his Pigeon Forge Campground. The final portion of his testimony consisted of statements concerning his gross receipts from operating Pigeon Forge for the time period of 1979 through 1983.

McGann presented as a witness in his behalf Linda Schacht, the owner of a Safari Campground in the Gatlinberg area. She testified that she had visited the Gateway Campground in August of 1982 and had found the condition of the bathrooms quite dirty and the campground in a rather unkempt condition. She further testified that before this time when she had been at the campground she had not observed such conditions and that the heavy traffic during the World's Fair in the summer of 1982 had caused the conditions she had observed in her visit of August, 1982.

The next witness to testify was John Burton, the President of United Safari International at the time McGann purchased the Pigeon Forge Campground from Barnett in 1979. With regard to the restroom conditions, Burton testified that he had received no more complaints concerning Gateway than he had about other campgrounds in the Safari system and that his personal visits to Gateway had revealed bathroom facilities that "looked dirty" because of age and the nature of the materials used in their construction. He was asked, "During that period of time did you see any reason to revoke the franchise of Gate Campground?" He answered, "No, none whatsoever...."

Charles Chouinard, the President of Safari, was called as the next witness. He related information concerning Safari's claims for royalties and attorney fees due from the McGanns. He then testified concerning the inspection reports various Safari employees had prepared after they had inspected Gateway during the 1981 and 1982 years. He admitted that the restrooms had failed Safari's restroom certification, but stated that the Gateway facility as a whole had received either a two or three star rating out of a possible five and "an average report ... not a real good report."

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

Any conflict in testimony requiring a determination of the credibility of witnesses rests in the first instance with the trial court and will be given great weight by the appellate court, unless other real evidence compels a contrary conclusion. *See State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 282, 435 S.W.2d 803, 807 (1968); *Linder v. Little*, 490 S.W.2d 717, 723 (Tenn.App.1972).

We note that the evidence in the record presents some question concerning the degree of credibility the chancellor accorded Mr. McGann. McGann testified that he did not learn that Gateway Campground was within fifteen miles of his campground until about 1981. However, his testimony revealed that the contract by which he had acquired his campground specifically acknowledged that Gateway was within the fifteen mile radius. Karl Barnett, the seller to McGann, testified that he and McGann had discussed the location of Gateway and that McGann knew its precise location was within the fifteen mile radius when he agreed to buy the Pigeon Forge campground. John Burton, President of Business Broker, the former licensor, corroborated Barnett's testimony as did Ed Dodd, a vice president of Safari. From this testimony the chancellor found that McGann had waived the mileage limitation in the license agreement. Waiver is the voluntary relinquishment of a known right. *See Baird v. Fidelity-Phenix Fire Insurance Co.*, 178 Tenn. 653, 162 S.W.2d 384 (1942). Therefore, notwithstanding McGann's testimony to the contrary, the chancellor found that McGann had been well aware of the location of Gateway Campground when he acquired Pigeon Forge Campground.

McGann's assertion that the condition of the facilities at Gateway Campground constituted a breach of the license agreement by Safari fails in a material aspect. The agreement is quite explicit that the services required to be furnished by the licensee shall be measured by *"standards established from time to time by Safari* for all its licensee locations." (Emphasis supplied). There is no proof that the conditions existing at other Safari-licensed locations were below the standards established by Safari. The proof is to the contrary and shows that the standards established by Safari were met. We find that the evidence preponderates against the chancellor's finding that Safari breached the terms of the license agreement. McGann was not justified in refusing to pay the royalties required under Paragraph 3(c) of the agreement, and therefore, McGann breached the contract.

The contract provides that upon breach by a licensee ...

> SAFARI shall be entitled to either, at its option: (1) liquidated damages calculated by multiplying the highest yearly amount of all fees paid by LICENSEE under Section 3(c), times the number of years remaining in the terms, as calculated from the effective date of agreement; or (2) its available remedies at law ... If SAFARI is required or deems it advisable to initiate any action to enforce any of the terms, provisions, or covenants herein, LICENSEE agrees to pay any cost incurred by SAFARI in connection therewith including attorney fees.

SAFARI contends that it is entitled to damages calculated pursuant to the liquidated damages provision of the agreement. Liquidated damage provisions must be reasonable in relation to the terms of the contract and the certainty with which damages can be measured. There must be a reasonable relationship between the amount stipulated as liquidated damages and what might reasonably be expected in the event of a breach. *V.L. Nicholson Co. v. Transcon Inv.*, 595 S.W.2d 474 (Tenn. 1980).

In the case before us the proof establishes that during the years that McGann was operating under the Safari name, his revenues increased each year and always exceeded $100,000 per year. McGann paid the maximum amount required in Paragraph 3(c) for two consecutive years and that provision of the agreement is a reasonable stipulation as to the damages to be awarded for breach. In addition to the liquidated damages, Safari seeks legal fees and other expenses as provided by the contract. These matters should first be considered by the trial court. For the reasons stated, we affirm the judgment of the trial court dismissing McGann's original suit and dismissing Safari's cross-claim against Business Brokers, Inc. The trial court's judgment dismissing Safari's counter-claim is reversed, and judgment is entered for Safari against the McGanns for liquidated damages, attorney's fees and expenses as provided by the agreement. This case is remanded to the trial court for determination of the amount of judgment. Costs of appeal are adjudged against McGann.

NEARN, P.J. (W.S.), and TOMLIN, J., concur.

