IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 3, 2024 Session

## SH NASHVILLE, LLC ET AL. v. FWREF NASHVILLE AIRPORT, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 22-0569-BC      Anne C. Martin, Chancellor**

___

### No. M2023-01147-COA-R3-CV

___

This appeal arises out of a contract for the sale of a hotel property near the Nashville airport. After numerous amendments to the purchase and sale agreement, the seller declared the prospective buyer to be in default, sold the property to a different buyer, and retained over 18 million dollars in earnest money. The prospective buyer filed suit against the seller for a declaratory judgment that the liquidated damages provision in the contract was unenforceable and for conversion. The trial court dismissed the conversion claim and ruled in favor of the seller on summary judgment. We have concluded that the trial court erred in its disposition of both causes of action.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JEFFREY USMAN, J., joined.

Stephen H. Price, Nashville, Tennessee, for the appellants, SH Nashville, LLC, and UNI Nashville Airport Hotel, LLC.

Sarah Byer Miller, Garrah J. Carter-Mason, and Britt K. Latham, Nashville, Tennessee, for the appellee, FWREF Nashville Airport, LLC.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

UNI Nashville Airport Hotel, LLC ("UNI") entered into a Purchase and Sale Agreement ("the Agreement") with FWREF Nashville Airport, LLC ("Seller") on October 23, 2019, for the Hilton Nashville Airport on Elm Hill Pike in Nashville. UNI subsequently assigned the Agreement and all of UNI's rights, interests, and obligations therein to SH

Nashville, LLC ("SH"). For purposes of this appeal, SH and UNI will be referenced interchangeably and collectively as "Purchaser." The body of the Agreement is 64 pages long, and there are numerous schedules (denominated "Schedule A" through "Schedule Q") appended to the body of the Agreement.

The Agreement provides for a purchase price of $79,000,000, with Purchaser agreeing to deposit $1,750,000 in earnest money with a title company. The Agreement set the closing for January 3, 2020. During the contingency period, which extended from the date of the Agreement's execution through October 24, 2019, Seller was required to "use commercially reasonable efforts to cooperate with Purchaser in connection with Purchaser's investigations and inspections of the Property and the operation of the Hotel thereon." Pursuant to § 1.3(g), if Purchaser decided not to proceed with the transaction before the expiration of the contingency period, "for no reason or for any reason whatsoever, in its sole and absolute discretion," Purchaser had the right to terminate the Agreement and receive its earnest money, with each party paying half of the escrow expenses. Section 2.2(e) of the Agreement states that, if Purchaser did not terminate the Agreement as permitted under § 1.3(g), "the Earnest Money will be deemed earned by Seller and non-refundable to Purchaser for any reason except as otherwise specifically set forth in this Agreement."

Section 4.3 of the Agreement deals with remedies regarding representations and warranties. Under § 4.3(d)(ii), "Purchaser shall have no right to file an action for rescission in connection with any breaches of Seller's representations or warranties." Subsection 4.3(d)(v) provides that, "in no event shall Seller be liable for any incidental, consequential, indirect, punitive, special or exemplary damages, or for lost profits, unrealized expectations or other similar claims except those of third parties against which Seller has indemnified Purchaser." Subsection 4.3(e) is a detailed and thorough release provision, which states, in pertinent part:

> Purchaser realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to claims which are presently unknown, unanticipated and unsuspected, and Purchaser further agrees, represents and warrants . . . that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Purchaser nevertheless hereby intends to release, discharge and acquit Seller, except with respect to the Seller party obligations, from any such unknown claims which might in any way be included as a portion of the consideration given to Seller by Purchaser in exchange for Seller's performance hereunder.

Section 4.4 of the Agreement sets out covenants between Seller and Purchaser. Subsection (n) of section 4.4 addresses Purchaser's responsibility to apply for a hotel franchise:

Promptly after the Effective Date [the date of the execution of the Agreement], Purchaser shall submit a franchise application to Franchisor [Hilton Franchise Holding LLC], together with all required related documents and submittals, and shall pay all fees and costs imposed by Franchisor in connection with the New Franchise. During the Contingency Period (and commencing immediately upon the Effective Date), Purchaser shall use its commercially reasonable efforts, and pay all costs and expenses therewith associated, to obtain a franchise commitment and new franchise agreement (the "New Franchise") with respect to the Property from Franchisor. Seller and Purchaser shall cooperate with each other and Franchisor to expedite completion of the same; provided, however, that the receipt of the New Franchise by Purchaser will not be a condition to Purchaser's obligation to close under this Agreement. . . .

Subsection (o) contemplates the possibility that Purchaser elects not to enter into a franchise agreement with Franchisor. Neither § 4.5, which addresses conditions precedent to Purchaser's obligations under the Agreement, nor any other provision of the Agreement made Purchaser's obligation to purchase the property contingent on Purchaser's ability to obtain financing.

Section VI of the Agreement addresses remedies. Section 6.1 states, in pertinent part, as follows:

Prior to entering into this transaction, Purchaser and Seller have discussed the fact that substantial damages will be suffered by Seller if Purchaser shall fail to perform its obligations under this Agreement and such failure is not caused by (i) a default by Seller under the Agreement, (ii) the failure of any condition precedent to Purchaser's obligations under this Agreement, or (iii) Purchaser's termination of this Agreement in accordance with its terms. *Due to the fluctuation in land values, the unpredictable state of the economy and of governmental regulations, the fluctuating money market for real estate loans of all types, and other factors which directly affect the value and marketability of the Property, the parties recognize that it would be extremely difficult and impracticable, if not impossible, to ascertain with any degree of certainty the amount of damages which would be suffered by Seller in the event of Purchaser's failure to perform its obligation to purchase the Property under this Agreement.* Accordingly, the parties agree that a reasonable estimate of Seller's damages in such event is the amount of the Earnest Money, and if Purchaser defaults in any material respect in performing the obligation to purchase the Property under this Agreement to close, . . ., then Seller, as its sole remedy therefor, after delivery of written notice to Purchaser of such failure and the expiration of a five (5) business day cure period from delivery of such notice, shall be entitled to

immediately terminate this Agreement by giving Purchaser written notice of such effect, and receive and retain the Earnest Money as liquidated damages . . . . Upon the occurrence of a Purchaser default entitling Seller to receive and retain the Earnest Money as liquidated damages and following proper termination of the Agreement by Seller pursuant to Section 6.1, Purchaser hereby waives and releases all rights to purchase the Property . . . .

(Emphasis added). Under subsection 6.2, if Seller defaulted, Purchaser's sole and exclusive remedies were to proceed to closing and waive the default, terminate the Agreement and receive a return of the earnest money and reimbursement for out-of-pocket expenses, or seek specific performance within 60 days of the scheduled closing date.

The Agreement also includes a provision stating, "Time is of the essence of this Agreement and of the obligations of the parties to purchase and sell the Property."

Purchaser was not prepared to close as agreed on January 3, 2020, and the parties entered into an amendment to the Agreement ("Amendment 1") on November 1, 2019. Amendment 1 allowed Purchaser to postpone the closing date to January 15, 2020, and Purchaser agreed to make an additional earnest money payment of $500,000.[1] Even with the extension on the closing date, Purchaser was unable to close. The parties executed Amendment 2, which extended the closing date to February 19, 2020, increased the purchase price by $750,000, and required Purchaser to pay additional earnest money in the total amount of $2.5 million. Amendment 2 also provided that the earnest money paid by Purchaser to date was "deemed earned by Seller and non-refundable to Purchaser for any reason" and that the additional $2.5 million in earnest money was also "deemed earned and non-refundable."

Purchaser was unable to close by February 19, 2020, and the parties executed Amendment 3, extending the closing date until March 20, 2020, increasing the purchase price to $82,125,000, and requiring Purchaser to make three additional earnest money payments totaling $4,462,500. Amendment 3 acknowledged that Purchaser had "been unable to perform its obligations to close at numerous previously agreed Closing Dates" and that "Seller had acted in good faith and has continuously been prepared to close" but had "agreed to extensions requested by Purchaser as a result of its inability to perform" under the Agreement. Moreover, Amendment 3 affirmed that the earnest money paid by Purchaser had been "deemed earned by Seller and is non-refundable to Purchaser for any reason" other than a material default by Seller and a failure to cure. Similarly, all additional earnest money required under Amendment 3 would be deemed "earned by Seller (whether delivered or not), and shall be non-refundable to Purchaser" with the same caveat for a material default. Purchaser released Seller from "any and all claims or demands . . . in

---

[1] Amendment 1 also allowed an extension through November 4, 2019, for Purchaser to pay the second installment on the original earnest money required by the Agreement.

regard to the Earnest Money" and agreed that the Agreement constituted a complete defense to any such lawsuit by Purchaser. The parties authorized the immediate release to Seller of any earnest money delivered by Purchaser to the title company.

At this point, the COVID-19 pandemic emerged. Purchaser exercised a postponement option included in Amendment 3 to further extend the closing date to April 3, 2020, in exchange for another earnest money payment of $1,000,000. Purchaser and Seller subsequently negotiated and executed another 21 amendments to the Agreement, extending the closing date and adding earnest money payments. During the continuing negotiations, on or about October 21, 2020, it became public that there were plans to open a new Hilton Hotel on the Nashville Airport property in late 2023. Purchaser was surprised by this announcement and believed that this new Hilton Hotel would detrimentally affect the value of the hotel property being conveyed in the Agreement. The parties proceeded to execute the three final amendments to the Agreement, each providing for a new closing date and additional earnest money.

In total, the parties executed 24 amendments to the Agreement. The last amendment, Amendment 24, was effective December 17, 2020, and set a closing date of January 11, 2021. With each amendment, the parties confirmed all of the terms and provisions of the Agreement, as modified. At the end of the amendment process, Purchaser had deposited a total of $18,917,500 in earnest money.

Purchasers were unable to close on January 11, 2021. Seller opted to declare Purchaser in default and claimed ownership of all of the earnest money. In late May 2021 and June 2021, Purchaser secured a lender and contacted Seller about purchasing the property. Seller refused, and Purchaser initiated this lawsuit on April 22, 2022.

The lawsuit

In its complaint, Purchaser asserted causes of action for a declaratory judgment and conversion. Purchaser specifically sought a declaration by the trial court that its forfeiture of the earnest money to Seller "pursuant to the terms and conditions of the Hotel Purchase Agreement, including its Earnest Money Forfeiture Provisions," constituted "an invalid and unenforceable penalty." Further, Purchaser requested a court order requiring Seller to refund the earnest money or to award damages to Purchaser in the amount of the earnest money. Seller filed a motion to dismiss Purchaser's complaint on the ground of failure to state a claim upon which relief can be granted pursuant to Tenn. R. Civ. P. 12.02. In August 2022, the trial court entered an order denying Seller's motion as to the declaratory judgment claim and granting the motion as to the claim for conversion.

After the trial court's ruling on Seller's motion to dismiss, Purchaser filed a second amended complaint, and Seller filed an answer and countercomplaint. In its countercomplaint, Seller asserted claims for breach of contract and attorney fees. At a

scheduling conference, Purchaser argued that it should be allowed to proceed with discovery; Seller requested a stay of discovery on the ground that there was no need for discovery because the issues could be determined based solely upon the Agreement. The court stayed discovery and, in December 2022, Seller moved for summary judgment in its favor on all claims and counterclaims.

In February 2023, Purchaser filed a brief in opposition to Seller's motion for summary judgment and a request to lift the discovery stay and continue the hearing. In support of its opposition to Seller's motion for summary judgment, Purchaser submitted the affidavit of Howard Wu, a member of SH Nashville, LLC, and UNI Nashville Airport Hotel, LLC. In his affidavit, Mr. Wu described the events that led up to the Agreement, the impact of COVID-19, the continued negotiations between the parties, the amendments to the Agreement, and the announcement of the new Hilton at the airport. Mr. Wu averred that he and his business partner "estimated that losing the Hilton brand affiliation and Nashville airport market exclusivity would have a significantly negative impact of as much as $30 million on the value of the Hotel" and would have a "very detrimental impact on the projected net operating revenues" for the hotel property.

Mr. Wu asserted that he and his business partner, Taylor Woods, "reasonably believe based on our prior experience in the hotel industry, that the Seller would have received advance notice of Hilton's approval of the on-airport Hilton" and that Seller "should have notified us of those plans." Mr. Wu's affidavit also avers that, having contributed almost $18 million in earnest money, he and Mr. Taylor "were then in dire financial straits and extreme economic stress." He averred that he and Mr. Taylor "felt we had no realistic choice but to sign under economic duress further amendments and extensions of the closing date for the Hotel and to provide personal guarantees, while we attempted in good faith to secure a new replacement lender during the middle of the Pandemic."

The trial court heard arguments on Seller's motion for summary judgment on April 19, 2023, and the court entered a memorandum and opinion on May 24, 2023, making detailed findings of fact and granting summary judgment in favor of Seller. The court concluded that there were no genuine issues of material fact and that "the earnest money forfeiture provision in the [Agreement] is enforceable, as amended by the Amendments." The court found that enforcement of the forfeiture provision was appropriate "because it was a reasonable prediction of the actual damages Seller would suffer if Purchasers breached the contract and does not violate public policy." The court, therefore, dismissed Purchaser's declaratory judgment claim and awarded judgment against Purchasers for breach of contract. Further, the court found that, under the Agreement, Seller was also entitled to attorney fees and ordered Seller to submit a fee petition. Purchaser did not oppose Seller's fee petition and, on July 14, 2023, the trial court awarded attorney fees to Seller.

Purchaser appeals and presents the following issues, which we have reworded and reordered:

(1) Whether the trial court erred in dismissing Purchaser's claim for conversion based upon the economic loss doctrine.
(2) Whether the trial court erred in granting Seller's motion for summary judgment in its favor on Purchaser's declaratory judgment claim and Seller's breach of contract counterclaim.
(3) Whether the trial court erred in staying discovery.
(4) Whether the trial court erred in granting Seller's request for attorney fees.

ANALYSIS

I.    Conversion

The first issue is whether the trial court erred in dismissing Purchaser's claim for conversion pursuant to Tenn. R. Civ. P. 12.02(6) for failure to state a claim upon which relief may be granted. A motion under Rule 12.02(6) "challenges the legal sufficiency of the complaint, not the strength of the plaintiff's proof." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002). In reviewing the trial court's ruling, we must "construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Id.* We review the trial court's legal conclusions de novo with no presumption of correctness. *Id.* at 696-97.

The trial court granted Seller's motion to dismiss the conversion claim based upon the economic loss doctrine, a "judicially-created rule of relatively recent vintage," which originated "in response to modern products liability law from a concern that products liability and tort law would erode or consume contract law." *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 142 (Tenn. 2021). When it applies, the economic loss doctrine "'operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.'" *Id.* (quoting *Plourde Sand & Gravel v. JGI E., Inc.*, 917 A.2d 1250, 1253 (N.H. 2007)). The trial court in the present case accepted Seller's argument that the economic loss doctrine should apply in this case, citing *Commercial Painting Co. Inc. v. Weitz Co. LLC*, No. W2019-02089-COA-R3-CV, 2022 WL 737468 (Tenn. Ct. App. Mar. 11, 2022). In *Commercial Painting*, a case arising out of a commercial construction contract, this Court concluded that "the economic loss rule is applicable to construction contracts negotiated between sophisticated commercial entities." 2022 WL 737468, at *1. However, our Supreme Court subsequently reversed this Court's holding. *See Com. Painting Co. Inc. v. Weitz Co. LLC*, 676 S.W.3d 527, 540 (Tenn. 2023). The Supreme Court held that, "the economic loss doctrine only applies in products liability cases and should not be extended to other claims." *Id.* at 529. Thus, the trial court's dismissal of Purchaser's conversion claim based upon the economic loss doctrine was in error.

- 7 -

On appeal, Seller asserts that Purchaser's conversion argument must fail in light of the trial court's subsequent summary judgment decision. Seller argues that the trial court's "analysis and decision on the enforceability of the liquidated damages provision is necessarily dispositive of the conversion claim as well." As will be discussed below, however, we have concluded that the trial court erred in granting summary judgment regarding the enforceability of the liquidated damages provision. We conclude that the trial court erred in dismissing Seller's conversion claim.

## II. Summary judgment

Purchaser's main argument on appeal is that the trial court erred in granting summary judgment in Seller's favor on the declaratory judgment action (as well as Seller's breach of contract counterclaim).

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This standard of review means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264 (emphasis omitted). Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; see also *Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show that he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting

- 8 -

affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

Are there disputed issues of material fact in this case, as argued by Purchaser, or was the case properly decided by the trial court as a matter of law, as argued by Seller? Under the express terms of the Agreement and the 23 amendments thereto, Purchaser agreed that the earnest money was non-refundable and a reasonable measure of liquidated damages in the event that the deal failed to close. Purchaser argues that the circumstances surrounding the formation of the Agreement and the amendments show severe economic duress and that the forfeiture provisions constitute a penalty, in violation of public policy.

At the heart of this case is the Agreement and the amendments to the Agreement. The interpretation of a contract is a question of law, which we review de novo with no presumption of correctness. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). When interpreting a contract, a court's task "'is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973) (quoting 17 AM. JUR. 2D, *Contracts*, § 245)). Courts ascertain the parties' intent by considering "'the usual, natural, and ordinary meaning of the contractual language.'" *Id.* at 889-90 (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). If the contractual language is clear and unambiguous, "the literal meaning of the language controls," and the determination of the parties' intent "is generally treated as a question of law because the words of the contract are definite and undisputed," leaving no genuine factual issue for a court or jury to decide. *Id.* at 890 (citing 5 Joseph M. Perillo, CORBIN ON CONTRACTS, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)).

When the terms of a contract are unambiguous, "issues of contract interpretation are regularly considered issues of law, which in turn make them well-suited for summary judgment." *Strategic Acquisitions Grp., LLC v. Premier Parking of Tenn., LLC*, No. E2019-01631-COA-R3-CV, 2020 WL 2595869, at *4 (Tenn. Ct. App. May 22, 2020). As our Supreme Court has stated:

> Tennessee cases have stressed that courts cannot make a new contract for parties under the guise of interpretation, even where a contract contains terms that appear harsh or unjust. "A court is not at liberty to make a new contract for parties who have spoken for themselves."

*Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 701 (Tenn. 2019) (quoting *Smithart v. John Hancock Mut. Life Ins. Co.*, 71 S.W.2d 1059, 1063 (Tenn. 1934)).

In the case before us, Purchaser asserts that the liquidated damages provisions in the Agreement and the amendments constitute a penalty and are therefore unenforceable as a matter of public policy, in accordance with Tennessee law. The leading Tennessee case on the enforceability of liquidated damages provisions is *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88 (Tenn. 1999). The trial court in *Guiliano* granted summary judgment in favor of the employee against the employer in a constructive termination suit. *Guiliano*, 995 S.W.2d at 91. The Court of Appeals agreed that the employee had been constructively terminated but concluded that the employee had no right to recover because a liquidated damages provision in the employment contract imposed a penalty on the employer and was, therefore, unenforceable. *Id.* at 91, 94. The Supreme Court affirmed summary judgment on the issue of constructive termination and found that the liquidated damages provision was enforceable. *Id.* at 91.

As the Court explained in *Guiliano*, "[t]he term 'liquidated damages' is defined by case law as a 'sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur.'" *Id.* at 96-97 (quoting *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn. 1980); *Kimbrough & Co. v. Schmitt*, 939 S.W.2d 105, 108 (Tenn. Ct. App. 1996)). The Court set out the following guiding principles:

> The fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. *V.L. Nicholson*, 595 S.W.2d at 484; 22 AM. JUR. 2D *Damages* § 683 (1988); RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. (1979). By stipulating in the contract to the damages that might reasonably arise from a breach, the parties essentially estimate the amount of potential damages likely to be sustained by the nonbreaching party. "If the [contract] provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages." *V.L. Nicholson*, 595 S.W.2d at 484 (citing *City of Bristol v. Bostwick*, 146 Tenn. 205, 240 S.W. 774 ([Tenn.] 1922); 22 AM. JUR. [2D] *Damages* § 227 (1965)). However, if the stipulated amount is unreasonable in relation to those potential or estimated damages, then it will be treated as a penalty. 22 AM. JUR. 2D *Damages* § 686 (1988); RESTATEMENT (SECOND) OF CONTRACTS § 356 (1979).

*Id.* at 98. A "penalty" in this context refers to "'a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of non-performance, and

- 10 -

it involves the idea of punishment.'" *Harmon v. Eggers*, 699 S.W.2d 159, 163 (Tenn. Ct. App. 1985) (quoting 22 AM. JUR. 2D *Damages* § 213 (1965)), *overruled in part by Guiliano*, 995 S.W.2d at 100.

The *Guiliano* court discussed the split of authority among the states over the proper method to determine whether the liquidated damages provision imposes a penalty. *See Guiliano*, 995 S.W.2d at 98-99. Our Supreme Court adopted the "prospective approach," which "focuses on the estimation of potential damages and the circumstances that existed at the time of contract formation." *Id.* Thus, regardless of the actual damages at the time of breach, a liquidated damages provision will generally be enforceable if "the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or difficult to ascertain at the time of contract formation." *Id.* at 99. In adopting the prospective approach to evaluating liquidated damages, the Supreme Court recognized the importance of two interests: "the freedom of parties to bargain for and to agree upon terms such as liquidated damages and the limitations set by public policy." *Id.* at 100.

As a general rule, parties "are free to agree upon liquidated damages and upon other terms that may not seem desirable or pleasant to outside observers." *Id.* The Supreme Court concluded that "the prospective approach is the better rule based upon the consideration it affords to the intentions of the parties and to the freedom to contract." *Id.* The Court further instructed:

> When parties agree to a liquidated damages provision, it is generally presumed that they considered the certainty of liquidated damages to be preferable to the risk of proving actual damages in the event of a breach. 22 AM. JUR. 2D *Damages* § 726.

> Liquidated damages permit the parties to allocate business and litigation risks and often serve as part of the contractual bargain. In addition, they lend certainty to the contractual agreement and allow the parties to resolve defaults and other related disputes efficiently, when actual damages are impossible or difficult to measure. C.T. McCormick, HANDBOOK ON THE LAW OF DAMAGES § 157 (1935).

> The retrospective approach, however, undermines the certainty and other benefits afforded by liquidated damages. Under that approach, the parties are allowed to fully litigate actual damages following a breach of contract. If the nonbreaching party fails to prove actual damages, then he or she is barred from recovering the liquidated sum originally agreed upon in the contract. We find that it is unfair to require the nonbreaching party to prove actual damages in cases where the parties agreed in advance to a liquidated damages provision. Such a requirement ignores the original

- 11 -

intentions of the parties and defeats the purposes of stipulating in advance to potential damages.

We, therefore, adopt a prospective approach for addressing the recovery of liquidated damages. Under this approach, courts must focus on the intentions of the parties based upon the language in the contract and the circumstances that existed at the time of contract formation. Those circumstances include: whether the liquidated sum was a reasonable estimate of potential damages and whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract. *See V.L. Nicholson*, 595 S.W.2d at 484. If the provision satisfies those factors and reflects the parties' intentions to compensate in the event of a breach, then the provision will be upheld as a reasonable agreement for liquidated damages. However, if the provision and circumstances indicate that the parties intended merely to penalize for a breach of contract, then the provision is unenforceable as against public policy.

*Id.* at 100-01 (footnote omitted).

As discussed above, the Court in *Guiliano* set out the following analysis for determining the enforceability of a liquidated damages provision: such a provision is enforceable if (1) "the liquidated sum is a reasonable prediction of potential damages and [(2)] the damages are indeterminable or difficult to ascertain at the time of contract formation." *Id.* at 99. In the present case, Sellers rely on § 6.1 of the Agreement, which states, in pertinent part:

Due to the fluctuation in land values, the unpredictable state of the economy and of governmental regulations, the fluctuating money market for real estate loans of all types, and other factors which directly affect the value and marketability of the Property, the parties recognize that it would be extremely difficult and impracticable, if not impossible, to ascertain with any degree of certainty the amount of damages which would be suffered by Seller in the event of Purchaser's failure to perform its obligation to purchase the Property under this Agreement. Accordingly, the parties agree that a reasonable estimate of Seller's damages in such event is the amount of the Earnest Money[.]

This language indicates that the parties agreed to the presence of the two factors necessary for a liquidated damages provision to be enforceable.

Is the parties' agreement to these factors sufficient to prevent the liquidated damages provision from violating public policy, or is a court required to make its own independent finding concerning the *Guiliano* factors? There are several cases relevant to this question.

- 12 -

In *Eatherly Construction Co. v. HTI Memorial Hospital*, No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *1 (Tenn. Ct. App. Sept. 12, 2005), a construction company filed suit against a hospital for breach of contract, and the hospital responded with a counterclaim to recover liquidated damages in the amount of $500 a day for each day of delay on the project. The liquidated damages provision included the following language: "These liquidated damages are cumulative and additive and represent a reasonable estimate of [the hospital's] expenses for extended delays and administrative costs associated with such delay." *Eatherly*, 2005 WL 2217078, at *7. The trial court denied both parties summary judgment on the hospital's claim for liquidated damages. *Id.* at *3. After the hospital put on its case in chief at an evidentiary hearing, the court dismissed the hospital's claim for liquidated damages. *Id.* The trial court made a factual finding that the hospital "failed to establish that the liquidated sum, $500 a day, was a reasonable estimation of the damages it would likely suffer in the event of a delay."[2] *Id.* at *5. The trial court, therefore, determined that the liquidated damages provision constituted a penalty and was unenforceable. *Id.*

On appeal, this Court affirmed the trial court's finding that "the evidence was inadequate to establish the liquidated sum agreed upon was a reasonable estimate." *Id.* at *9. The court compared the facts before it to the facts in *Guiliano*:

> In *Guiliano,* the parties used a relevant and material economic value, that value was the annual salary of Anthony Guiliano. It represented the value for which Mr. Guiliano was willing to work and the value for which Cleo Inc. was willing to compensate him for his services. The significance of this value is that the parties did not pull a figure out of the air. To the contrary, they used a previously agreed upon value (Guilano's salary) which value was relevant to the damage Guiliano was likely to sustain in the event his employment was terminated in violation of the agreement.
>
> Here, the trial court specifically found there was no proof in the record to support a finding that the liquidated sum agreed upon was a reasonable estimate of the damages to be incurred by Memorial. The best, if not only evidence offered by Memorial to support its contention that $500 per day is reasonable is that the parties "agreed" to the amount. *While the fact the parties "agreed" to the amount is relevant, and it is a factor to be considered in order to determine whether the amount was a reasonable estimate at the time the parties entered into the contract, that evidence-the parties'*

---

[2] In its ruling from the bench, the court stated that, "there is a lack of evidence as to how this provision was negotiated and what was the foresight that these individuals had when they entered into it as to what might be the potential harm." *Eathery*, 2005 WL 2217078, at *5.

*agreement-standing alone does not preponderate against the trial court's specific finding to the contrary.*

*Id.* (footnote[3] omitted). This Court ruled that the parties' agreement regarding the reasonableness of the amount of liquidated damages was not dispositive.

In *Shoney's North America, LLC v. Smith & Thaxton, Inc.*, No. 3:12-cv-00625, 2014 WL 7369987, at *1 (M.D. Tenn. Dec. 29, 2014), a federal district court case applying Tennessee law, the Middle District court considered the enforceability of a liquidated damages provision in a license agreement between Shoney's North America ("SNA") and the owners of two restaurants. SNA filed suit against the restaurant owners for breach of contract. *Shoney's*, 2014 WL 7369987, at *1. Under the terms of the license agreements, the measure of damages to be paid was "a lump sum equal to the royalty fees and production fund contributions payable to [SNA] during the 13 periods [1 year] immediately preceding the termination." *Id.* at *11 . The license agreements also included the following language:

> You acknowledge that the determination of our actual damages caused by the termination of this Agreement as set forth above would be extremely difficult, if not impossible, and that the liquidated damages provided for above represent a fair and reasonable estimate of those damages.

*Id.* SNA filed a motion for summary judgment supported by the declaration of Catherine Hite, Executive Vice President and General Counsel for SNA. *Id.* at *4. In her declaration, Ms. Hite averred that the itemization and calculation of damages in the notice of termination sent to the defendants were true and correct and that the defendants owed "the amounts stated in the Accounts Receivable Detail." *Id.* The magistrate denied SNA's motion for summary judgment on the basis that there remained disputed issues of material fact. *Id.* at *2. SNA filed objections to the magistrate's recommended disposition. *Id.*

After reviewing the teachings of *Guiliano* and Tennessee cases upholding liquidated damages provisions at the summary judgment stage, the district court noted that "neither party presented any extrinsic evidence regarding 'the circumstances that existed at the time of contract formation.'" *Id.* at *14 (quoting *Guiliano*, 995 S.W.2d at 100). Moreover, the court emphasized that the parties had stipulated in the contract to the difficulty of determining actual damages and the reasonableness of the liquidated sum as an estimate of

---

[3] In this footnote, the court stated that the only other evidence (in addition to the agreement of the parties) that the hospital offered was testimony that "substantiated only the difficulty ascertaining actual damages in the event of construction delays" and "provided no guidance as to how the figure $500 per day was ascertained or its reasonableness." *Eatherly*, 2005 WL 2217078, at *9 n.12.

actual damages. *Id.* The court then examined the arguments presented by the defendant restaurants:

> The defendants' attempt to refute the clear terms of the contract is feeble at best. The defendants insist that the estimation was not reasonable because the liquidated-damages sum included an amount equal to both the royalty fees and production fund contributions payable to SNA during the one-year period immediately preceding termination. The defendants seem to concede that the royalty fees alone would have been reasonable; they contend only that including the production fund contributions as well placed the estimated damages over and above what would have been a reasonable estimation of SNA's damages, because the production fund contributions were not an asset of SNA's.

> This argument is unavailing. The production fund fees are addressed in Section 9.A of the License Agreements. This clause required SNA to maintain and administer "a National Production Fund ('the 'Production Fund') for the marketing programs [SNA] deem[ed] necessary or appropriate." (License Agreements § 9.1.) It is reasonable to assume, based on this clause, that SNA's commitment to provide advertising for its licensees was ongoing and that its advertising costs did not immediately diminish as a result of the termination of one or two license agreements. The inclusion of the advertising fee (which amounts to $8,071 of the total damages of $59,430.27 sought by SNA) did not *per se* render the liquidated-damages provision unreasonable.

> The defendants further argue that damages are inherently a question of fact that cannot be resolved on summary judgment and that the plaintiff's proof of damages, supported only by the "conclusory" declaration of Catherine Hite and the documentation attached to the complaint, is insufficient. The defendants, however, do not refute any part of Catherine Hite's declaration or the plaintiff's assertions regarding the damages owed, and they have presented no evidence to suggest that the liquidated-damages clause at Section 16 of the License Agreements functions as a penalty or unenforceable forfeiture. A dispute of fact is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). The defendants have not effectively refuted the evidence offered by the plaintiff.

*Id.* at *14-15. The court concluded that the defendants had not established the existence of a material dispute of fact and held that SNA was entitled to summary judgment on the breach of contract claims. *Id.* at *15.

We find it significant that, in *Shoney's North America*, the party moving for summary judgment, SNA, supported its motion with a declaration and explanation of how the party calculated the amounts of liquidated damages. In the present case, the moving party, Seller, supported its motion only with a statement of undisputed material facts and the Agreement and amendments. These contracts do not contain a metric for calculating the amount of liquidated damages or an explanation of the basis for the amounts provided. Rather, the contracts simply establish amounts of liquidated damages agreed to by the parties as the negotiations continued.

In its opinion, the trial court likened this case to *Kendrick v. Alexander*, 844 S.W.2d 187 (Tenn. Ct. App. 1992), which also involved a real estate purchase agreement. The original contract required $10,000 in earnest money with a total purchase price of $500,000. *Kendrick*, 844 S.W.2d at 188. The parties later extended the closing date and provided for additional liquidated damages in the total amount of $50,000. *Id.* at 189-90. This Court found that, under the circumstances, the $60,000 in liquidated damages was "reasonable in relation to the terms of the parties' contract." *Id.* at 190. The court noted that "the parties' renegotiation of the liquidated damages provision comprised part of the consideration for Defendants' extensions of the closing date." *Id.* at 190-91. In distinguishing the circumstances before it from those in *Harmon v. Eggers*,[4] the court emphasized that "the amount of liquidated damages equals only twelve percent (12%) of the purchase price." *Id.* at 191. The court reversed the trial court's determination that the amount of liquidated damages constituted a penalty. *Id.*

We find *Kendrick* distinguishable from the present case because the trial court held an evidentiary hearing. Moreover, *Kendrick* predates *Guiliano*, when our Supreme Court adopted the prospective approach and stated that "courts must focus on the intentions of the parties based upon the language in the contract *and the circumstances that existed at the time of contract formation*." *Guiliano*, 995 S.W.2d at 100 (emphasis added). Post-*Guiliano* caselaw has focused on the two circumstances enumerated by the Supreme Court: "whether the liquidated sum was a reasonable estimate of potential damages and whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract." *Id.* at 100-01.

In *Anesthesia Medical Group, P.C. v. Chandler*, No. M2005-00034-COA-R3-CV, 2007 WL 412323, at *1 (Tenn. Ct. App. Feb. 6, 2007), the trial court granted summary judgment to a nursing student who entered into a loan agreement with a medical group. As part of the agreement, the student agreed to work for the medical group for three years after

---

[4] *Harmon v. Eggers*, 699 S.W.2d 159 (Tenn. Ct. App. 1985), is one of the cases overruled by *Guiliano*, 995 S.W.2d at 100, because of the court's application of the prospective approach. The contract at issue in *Harmon*, a real estate purchase and sale agreement, provided for the purchasers' forfeiture of more than 50% of the purchase price at the time of default. *Harmon*, 699 S.W.2d at 164. After a trial, the lower court ruled in favor of the sellers. *Id.* On appeal, this Court determined that the liquidated damages provision constituted a penalty and should have no effect. *Id.*

she graduated from her certified registered nurse anesthetist ("CRNA") program. *Anesthesia Med.*, 2007 WL 412323, at *1. Seven months prior to her graduation, the student notified the group that she would not be able to work for the group after graduation. *Id.* She repaid the loan with interest. *Id.* The medical group then filed suit for $15,000 in liquidated damages, as provided for in the contract. *Id.* The trial court granted the student's motion for summary judgment, holding that the liquidated damages provision constituted an unlawful penalty. *Id.* This Court reversed the trial court's grant of summary judgment after finding that there remained disputed issues of material fact. *Id.* The loan agreement included the following rationale for the liquidated damages provision:

> Student and AMG [the medical group] through their execution of this agreement hereby acknowledge that AMG has invested substantial time and monies in the development and training of Student and that Student's termination would detrimentally affect the operations of AMG. Student and AMG further agree that the harm to AMG would be difficult, if not impossible, to quantify and that the above amounts are reasonable and appropriate under the circumstances and fairly represent that loss which would be suffered by AMG. Payment shall be made within thirty (30) days of the date of separation.

*Id.* at *2 (footnote omitted). Thus, the parties agreed in the contract that the two circumstances described in *Guiliano* were satisfied. Nevertheless, the court proceeded to consider whether the undisputed evidence established that "at the time the parties entered into the contract, the amount of the liquidated damages was a reasonable prediction of potential damages AMG would suffer if Ms. Chandler breached her employment commitment and whether the exact amount of such potential damages was indeterminable or difficult to ascertain." *Id.* at *10.

The appellate court examined the record for proof. *Id.* The record included an affidavit from the medical group's human resources director concerning the shortage of CRNAs; she averred that, when a student broke an employment commitment, the group incurred "significant expenses in hiring a replacement." *Id.* at *11. The record also included the student's letter to the group notifying it of her inability to work for the group following graduation due to her impending move to Huntsville. *Id.* In her letter, the student requested a waiver of the liquidation fee. *Id.* Also in the record was the medical group's subsequent letter refusing to grant a waiver. *Id.* The court analyzed the situation as follows:

> These statements imply, but do not clearly establish, that AMG would necessarily sustain damages if a student, before graduation, declined to accept employment at AMG. While they may show that AMG would incur the kind of costs described above if an employed, sponsored CRNA left employment, they do not explain how AMG will necessarily incur those

- 17 -

costs when given more than six months' notice that a sponsored student will not be coming to work for them as anticipated.

Interestingly, there are other situations that result in a sponsored student never coming to work for AMG that do not trigger the liquidated damages provision, although the student is obligated to repay the loan with interest. Those include dismissal of the student from the training program; discontinuance of the training program by the student and failure to re-enroll at the earliest opportunity; and failure of the student to apply for, take, and pass the certification examination within two years after graduation.

Ms. Chandler asserts that by giving AMG seven months notice before her graduation, she gave AMG sufficient time to find a replacement for her before her anticipated start date. Because our analysis must focus on the situation at the time of contract formation, we interpret this argument as asserting that it was not foreseeable at the time the parties entered into the contract that AMG would necessarily sustain damages if a student failed to become an AMG employee but notified AMG of that fact prior to graduation and prior to specific employment arrangements being made.

*Id.* (footnotes omitted). The court concluded that neither party had established that it was entitled to summary judgment. *Id.*

*Bachour v. Mason*, No. M2012-00092-COA-R3-CV, 2013 WL 2395027, at *1 (Tenn. Ct. App. May 30, 2013), involved two contracts between the same parties regarding the sale of commercial property. The contracts provided that the buyer agreed to buy two adjacent lots from the developers for a total price of $300,000. *Bachour*, 2013 WL 2395027, at *1. According to a second contract, the buyer agreed to pay the remaining $75,000 due to the seller "within thirty days of the completion of the roads." *Id.* The contract further provided "that $1,000 was to be deducted from the $75,000 owed by Buyer to Sellers for each month after January 1, 2008 that those streets remained uncompleted." *Id.* If the streets were not completed by July 1, 2008, "the Sellers shall forfeit any balance remaining of the **SEVENTY-FIVE THOUSAND AND NO/100 ($75,000.00)** final payment." *Id.* In August 2008, the buyer filed a declaratory judgment action disputing the sellers' assertion that the roads had been completed on time as defined in the contract. *Id.* at *2. A trial was conducted, and the trial court invalidated the second contract for lack of additional consideration and awarded the sellers damages under the first contract, which did not include a liquidated damages provision. *Id.* at *3.

On appeal, this Court concluded that "the $75,000 'incentive' was unenforceable for reasons other than those relied upon by the trial court." *Id.* In its review of the applicable authorities, the court stated: "Tennessee law disfavors penalties, and an unreasonable liquidated damages provision will not be enforced, regardless of whether it

was agreed to by the parties." *Id.* at \*4. Moreover, "'[b]ecause forfeitures and penalties are not favored, any doubt as to whether a sum is a penalty or liquidated damages will generally be resolved as the former.'" *Id.* (quoting *Kimbrough & Co.*, 939 S.W.2d at 108, *overruled on other grounds by Guiliano*, 995 S.W.2d at 100). Addressing the evidence, the court stated:

> In this case, Buyer testified that the road was very important to his plans for the property, and that he had added the $75,000 provision to the contract in order to make Sellers aware of its importance and "to get their attention." Excerpts from Buyer's deposition that were read into evidence during his testimony referred to the provision as "a penalty" and as "a heavy penalty." Buyer was questioned closely about what damages he was likely to suffer in the event that the road was not completed on the agreed-upon date. He admitted that those damages were impossible to estimate, but he referred generally to the loss of marketability of the property, the possibility of lost sales, and falling prices of real estate at the time.

> The proof showed that Buyer had already contracted to sell the property for $325,000 at the time of the November 14 contract. Buyer argued, however, that he had not yet closed on that sale and that his buyer would need the road for access to a planned Auto Zone store. He did not, however, present any evidence that Auto Zone had required that the road be completed by any particular date. Nor did he present any evidence, other than his own unsupported statement, about the condition of the real estate market in Cannon County in the last quarter of 2008.

> The testimony of the parties also shows that there was no discussion between Buyer and Sellers about the damages Buyer might suffer from any delays in the completion of the road. Instead, Buyer simply presented Sellers with the draft of the contract containing the $75,000 provision on November 14, 2007, and told them that if they did not sign he would walk away from the sale. When he was questioned at deposition about the $75,000 figure, Buyer did not attempt to justify it in terms of the magnitude of his possible losses, but simply stated that he wished he had asked for more, even though it was clear by that time that he had not suffered any actual damages.

> It thus appears to us that the $75,000 was not based on any estimate of potential damages, but was *just an arbitrary figure that Buyer plucked from thin air. There is no evidence to support his contention that the figure bears any relation to the potential damages he would likely have suffered* if the roads were not completed in the physical sense or if they were not accepted by the City, on or before the deadline date of July 1, 2008. We

- 19 -

conclude rather that the provision was a penalty designed to punish the Sellers and that it is therefore unenforceable.

*Id.* at *4-5 (emphasis added).

In light of *Guiliano* and related caselaw, we conclude that the trial court erred in granting summary judgment in favor of Seller in the present case. There is no evidence presented by Seller in support of its motion for summary judgment upon which the trial court could base a determination as to whether the amount of liquidated damages "was a reasonable estimate of potential damages." The language of the contracts stating that the parties agreed that the liquidated damages amounts were a reasonable estimate is not sufficient.[5] Therefore, we reverse the trial court's grant of summary judgment and remand for further proceedings consistent with this opinion.

Based upon our decisions regarding the first two issues, we consider the remaining issues pretermitted.

CONCLUSION

The judgment of the trial court is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellee, FWREF Nashville Airport, LLC, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[5] The trial court cited three cases in which the enforceability of liquidated damages was "found to be appropriate for consideration at summary judgment." We find these cases distinguishable from the present case. In *Guiliano*, "the parties used a relevant and material economic value, that value was the annual salary of Anthony Guiliano," upon which to base the amount of liquidated damages. *Eatherly*, 2005 WL 2217078, at *9. *Teter v. Republic Parking System, Inc.*, 181 S.W.3d 330, 343 (Tenn. 2005), involved an employment contract providing for severance pay, which the Court distinguished from liquidated damages. Moreover, the amount of severance pay was based upon the employee's salary and bonuses. *Teter*, 181 S.W.3d at 344. The federal district court in *Raley v. Jackson*, No. 3:04-0877, 2007 WL 1725254, at *8 (M.D. Tenn. June 12, 2007), granted the defendant's motion for summary judgment, upholding the enforceability of a liquidated damages provision included in a consulting agreement. In *Raley*, unlike in the present case, the evidence presented in support of the motion for summary judgment included a justification and rationale for the amount of liquidated damages and showed that the parties did not "pull a figure out of the air." *Raley*, 2007 WL 1725254, at *8.